<u>**IN THE UNITED STATES DISTRICT COURT**</u>

<u>**FOR THE DISTRICT OF MARYLAND**</u>

|  |  |
|---|---|
| MARTIN P. MOLER, JOHN T. CZAHOR, and KATHLEEN D'ASCENZO, individually and on behalf of participants and beneficiaries on behalf of the University of Maryland Medical System 401(a) Defined Contribution Plan and the UMMS Voluntary 403(b) Plan, | CIVIL ACTION NO.:  1:21-cv-01824 |
|  | **CLASS ACTION COMPLAINT** |
| Plaintiffs, |  |
| v. |  |
| UNIVERSITY OF MARYLAND MEDICAL SYSTEM and EMPLOYEE BENEFITS COMMITTEE, |  |
| Defendants. |  |

<u>**INTRODUCTION**</u>

1.      Plaintiffs Martin P. Moler, John T. Czahor, and Kathleen D'Ascenzo ("Plaintiffs"), by and through their attorneys, on behalf of the University of Maryland Medical System 401(a) Defined Contribution Plan ("401(a) Plan") and UMMS Voluntary 403(b) Plan ("403(b) Plan") (jointly the "Plans"), themselves, and all others similarly situated, allege as follows.

2.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciary, University of Maryland Medical System Corporation ("UMMS") and the Employee Benefits Committee ("Committee") (UMMS and the Committee collectively are "Defendants") for breach of fiduciary duties.

3.     Defined contribution retirement plans, like the Plans, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held **$9.6 trillion** in all employer-based defined contribution retirement Plan as of March 31, 2020.[1] *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $34.9Trillion in Fourth Quarter 2020* (March 18, 2021).[2]

4.     In a defined contribution plan, "participants" retirement benefits are limited to the value of their individual investment accounts, which is determined by the market performance, less expenses. *Tibble v. Edison Int'l*, 575 U.S. 523 (2015).  Because risks related to high fees and poorly performing investments are borne by the participants, the employer has no incentive to keep costs low or to monitor the Plan to ensure investments offered through the plan is prudent.

5.     To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers who offer and administer plans.  29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

---

[1] The 403(b) and 401(a) plans are "the non-profit analogue[s] to the far more common § 401(k) tax retirement plans used by private companies". *See Sweda v. University of Penn.*, No. 16-4329, 2017 U.S. Dist. LEXIS 153958, at *15 (E.D. Pa. Sept. 21, 2017) ("Today, the obligation of beneficiaries and fiduciaries in § 401(k) and § 403(b) plans are nearly identical…. Because of the modern-day similarity between the two retirement plans and the historical roots of ERISA's goal to create a uniform regulatory system for retirement plans, the analysis of the fiduciary standards for § 403(b) and § 401(k) retirement plans must be the same.").

[2] Available at: https://www.ici.org/research/stats/retirement/ret_20_q4
 (last visited April 13, 2021).

6.      As of December 31, 2018, the UMMS 401(a) Plan had more than $322,956,329 in assets. *See* UMMS 401(a) Plan Form 5500 for 2018[3], at Schedule H. As of December 31, 2019, the UMMS 401(a) Plan had more than $399,287,588 in assets. *See* UMMS 401(a) Plan Form 5500 for 2019, at Schedule H.

7.      As of December 31, 2018, the UMMS 403(b) Plan had $517,229,084 in assets. *See* UMMS 403(b) Plan Form 5500 for 2018, at Schedule H. As of December 31, 2019, the UMMS 403(b) Plan had more than $461,910,461 in assets. *See* UMMS 403(b) Plan Form 5500 for 2019, at Schedule H.

8.      At all relevant times, the Plans' assets have been entrusted to the care of the Plans' fiduciaries. The Plans qualify as large plans in the defined contribution plan marketplace.[4] As large plans, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plans' expenses or exercise appropriate judgment to scrutinize investment options offered by the Plans to ensure investments were prudent.

9.      During the proposed Class Period (July 22, 2015 to the present) Defendants, as fiduciaries of the Plans, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plans, to Plaintiffs, and to the other participants of the Plans by: (1) failing to prudently review the Plans' investment portfolio with due care to ensure that each investment option was prudent in terms of performance and cost; (2) failing to prudently select investment share classes for many of the funds within the Plans; (3) imprudently selecting and

---

[3] Form 5500s filed with the U.S. Department of Labor are referenced individually hereinafter as "Form 5500" and in the plural as "Form 5500s".

[4] Defined contribution retirement Plan are generally classified as "Micro" Plan (<$5 million in assets), "Small" Plan ($5 million-<$50 million), "Mid" Plan ($50-<$200 million), "Large" Plan ($200 million-<$1 billion), and "Mega" Plan (>$1 billion).

retaining funds in the Plans despite the availability of similar investment options with lower fees and/or better performance histories; (4) imprudently including and recommending the abusive "GoalMaker" asset allocation service furnished by Prudential Insurance Company ("Prudential"); and (5) imprudently failing to ensure the Plans' recordkeeping and total expenses were reasonable and not excessive.

10.     The Plans' imprudent investment options during the Class Period include: (1) Prudential's Principal Preservation Separate Account; (2) Principal's Mid Cap Blend, Diversified Real Estate Institutional, and High Yield Bond A; (3) American Funds Euro-pacific Growth; (4) Cohen & Steers Realty; (5) Diamond Hill Large-Cap; (6) Gabelli Small-Cap Growth A; (7) John Hancock Disciplined Value Mid-Cap R2; (8) Mass Mutual Sel Mid Growth R5; (9) Metropolitan West Total Return Bond Class M; (10) Oppenheimer Developing Markets; (11) Oakmark Fund I; (12) T.Rowe Price Blue Chip Growth; (13) Voya Small Cap Opportunity; (14) MFS New Discovery Value R6; (15) Artisan Mid-Cap Inst.; and (16) Virtus Ceredex SCV Eq. A.

11.     Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence, in violation of 29 U.S.C. § 1104. Defendants' actions and inactions were imprudent and contrary to actions of a reasonable and prudent fiduciary under the circumstances here and cost the Plans and their participants millions of dollars of hard-earned retirement savings.

12.     Based on this misconduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

13.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

14.     This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

15.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plans are administered, where at least one of the alleged breaches took place and where Defendants reside.

## STANDING

16.     An action under §1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *Id*. at 254. Section 1132(a)(2) authorizes any participant, fiduciary, or the Secretary of Labor to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. §1132(a)(2). As explained below, the Plans suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and the Plans remain exposed to harm and continued future losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent the Plaintiffs must also show an individual injury even though §1132(a)(2) does not provide redress for individual injuries, each Plaintiff has suffered such an injury.

17.     Plaintiffs and all participants in the Plans suffered financial harm as a result of the imprudent administration of the Plans because Defendants' selection and retention of poorly performing, high-cost, and imprudent investments deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plans if Defendants had satisfied their fiduciary obligations. All participants continue to be harmed by the ongoing inclusion of these imprudent options.

18.     Plaintiffs' individual accounts in the Plans were harmed because they invested in investment options that would have been removed from the Plans had Defendants prudently discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plans, resulting in a loss of retirement savings.

19.     Defendants touted an abusive and deceptive "GoalMaker" asset allocation service to the Plans and its participants. GoalMaker was represented by Defendants to participants as a service that would guide and assist participants to a model portfolio of investments available in the Plans and then rebalance accounts quarterly to ensure participants investment portfolios stay on target.

20.     GoalMaker funneled participants' retirement savings into overpriced investment products and into investments that paid kickbacks to Prudential Insurance Company ("Prudential"). GoalMaker directed investments away from the reliable, low-cost index funds in the Plan's investment menu available from reputable providers that did not pay substantial kickbacks to Prudential. This resulted in the participants paying excessive investment management fees, administrative expenses, and other costs over the Class Period, resulting in participants losing millions of dollars in retirement savings.

21.     Defendants could have and should have easily stopped the GoalMaker abuses at any time by replacing the obscenely high-fee, chronically underperforming GoalMaker funds with reliable, low-fee funds already in the Plan's investment menu – or funds readily available elsewhere. Further, prudent fiduciaries are also informed of two unrelated lawsuits filed in federal courts that raise awareness to the GoalMaker abuses described herein. Yet, Defendants imprudently took no action to protect the Plans' participants retirement savings.

22.     Year after year, Defendants chose to retain GoalMaker ignoring the abusive fees and costs, and the related lawsuits attacking GoalMaker. From a prudent fiduciary standpoint, GoalMaker is not a model of asset allocation, but a model of imprudent plan management.

## PARTIES

### Plaintiffs

23.     Plaintiff Martin Moler resides in Baltimore, Maryland. During his employment, from 2016 to 2020, Plaintiff Moler participated in the Plans, investing in certain options offered by the Plans, including: (1) Prudential's Preservation Separate Account; (2) Principal's Mid Cap Blend A and Institutional High Yield Bond A; (3) Cohen & Steers Realty; (4) American Funds Euro-Pacific Growth R4; (5) Metropolitan West Total Return Bond Class M; (6) Oppenheimer Developing Markets; (7) Oakmark Fund I; (8) T.Rowe Price Blue Chip Growth; (9) Voya Small Cap Opportunity; (10) MFS New Discovery Value R6; (11) Artisan Mid-Cap Inst.; and (12) Virtus Ceredex SCV Eq. A.

24.     Plaintiff John T. Czahor resides in Meridianville, Alabama. During his employment with UMMS, from 2011 to 2018, Plaintiff Czahor participated in the Plans and his investments were selected by GoalMaker, the Plan's default investment alternative, which selected the certain investment options offered by the Plans, including: (1) Principal Preservation Separate Account; (2) Delaware Diversified Income Fund A; (3) Diamond Hill Large Cap A; (4) Oakmark Fund I; (5) Vanguard Institutional Index I; (6) John Hancock Disciplined Value Mid Cap; (7) Morgan Stanley Inst Mid A; (8) Principal MidCap Blend A; (9) Gabelli Small Cap Gr; (10) RidgeWorth Small Cap Value; (11) Voya Small Cap Opp; (12) American Funds EuroPacific Gr. R4; (13) Cohen & Steer Realty Shares; (14) Metrop W Total Return Bond M; (15) Fidelity Advisor New Insights; (16) Artisan Mid Cap Instl.; (17) T. Rowe Price Blue Chip Growth; (18) Vanguard Mid Cap Index;

(19) Oppenheimer Developing Markets A; (20) Principal Diversified Real Assets; (21) MFS New Discovery Value R5; and (22) Virtus Ceredex SCV Eq. A.

25.    Plaintiff Kathleen D'Ascenzo resides in Parkville, Maryland. During her employment with UMMS, from 2011 to 2021, Plaintiff D'Ascenzo participated in the Plans and her investments were selected by GoalMaker, the Plan's default investment alternative, which selected the certain investment options offered by the Plans, including: (1) Principal Preservation Separate Account; (2) Metropolitan West Total Return Bond M; (3) Principal Diversified Real Asset; (4) Diamond Hill Large Cap A; (5) Oakmark Fund Investor Class; (6) Fidelity 500 Index Fund; (7) T. Rowe Price Blue Chip Growth; (8) John Hancock Disciplined Value Mid Cap Class R2; (9) Fidelity Mid Cap Index Fund; (10) MassMutual Mid Cap Growth Fund Class R5; (11) Principal MidCap Fund Class A; (12) MFS New Discovery Value R5; (13) Fidelity Small Cap Index Fund; (14) Wasatch Core Growth Fund; (15) American Funds EuroPacific Gr. R4; (16) Invesco Developing Markets A.

26.    As stated above, Plaintiffs have standing to bring this action on behalf of the Plans because they participated in the Plans and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts either currently or as of the time their accounts were distributed, and the calculated value that the accounts should have been worth, but for Defendants' breaches of fiduciary duty as described herein.

27.    Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of the Plans' investments versus available alternatives within similarly-sized Plans, total cost comparisons to similarly-sized Plans,

information regarding other available share classes, and information regarding the availability and pricing of separate accounts and collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

28.     Defendant University of Maryland Medical System Corporation ("UMMS") describes itself as "a university-based regional health care system focused on serving the health care needs of Maryland." It includes 14 hospitals, two freestanding emergency centers, and nearly 140 outpatient and urgent care centers. 2018 Annual Report, /www.umms.org/-/media/files/umms/about-us/annual-report/annual-report-2018.pdfvisited 3/2/2021. UMMS is the current Plan Sponsor for each Plan. It is a Maryland corporation with a listed address of 920 Elkridge Landing Rd., Linthicum, MD 21090. *See* 2019 Form 5500, at 1.

29.     For the entirety of the Class Period, UMMS has been the sponsor, administrator, and a fiduciary for each Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) UMMS is named as the Sponsor on the Form 5500 for each year of the Class Period for each Plan; (b) UMMS is a named fiduciary under each Plan; (c) during the Class Period, UMMS exercised discretionary authority and control over management and/or authority or control over management or disposition of Plan assets for each Plan; and (d) it appointed Plan fiduciaries through the Committees and was responsible for monitoring those fiduciaries for each Plan. *See*, *e.g.*, Summary Plan Description of the UMMS Voluntary 403(b) Plan, dated January 1, 2019 ("403(b) SPD").

30.     UMMS has the power to "designate persons other than the Administrator to carry out any duty or power which would otherwise be a fiduciary responsibility of the Administrator

under the terms of the Plan". *See* UMMS Voluntary 403(b) Plan, Amendment and Restatement dated Jan. 1, 2017 at 29.

31.     UMMS has delegated certain administrative and investment related duties for the Plans to the Committees.

32.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

33.     Defendant Employee Benefits Committee ("Committee") is comprised of individuals appointed by UMMS as fiduciaries to the Plans. During the Class Period, Employee Benefits Committee and the individuals on the committee exercised discretionary authority and control over management and/or authority or control over management or disposition of Plan assets for each Plan. They were also responsible to negotiate and scrutinize fees charged by third parties to the Plans.

## THE PLANS

34.     The Plans are "defined contribution" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34).

35.     Defined contribution plans such as the Plans here have become America's primary means of saving for retirement. This is the result of a gradual shift from the traditional, defined benefit "pension" plans to defined contribution plans. In the case of a traditional defined benefit "pension" plan, an employer has an incentive to make prudent investment decisions and to incur only reasonable costs because the employer is directly responsible for the financial consequences of mismanaging the plan. In contrast, in a defined contribution plan, employees bear the costs of the employer's imprudent financial decisions. Their retirement benefits are limited to the value of their individual accounts net of such costs. 29 U.S.C. § 1002(34). Thus, plan participants must rely

on their employer to carry out its fiduciary duties "with the care, skill, prudence, and diligence" that ERISA requires. 29 U.S.C. § 1104(a)(1).

### The Plans' Investments

36.     One of Defendants' important fiduciary duties is to select the investments for the Plans' investment menus. Superficially, the Plans are structured as cafeteria plans in which participants choose investment options for their individual accounts from the Plans' investment menus. However, it is a cafeteria in which Defendants control the menu; participants are captive investors whose choices are limited to the investment options Defendants select. Participants are also allowed to invest through a self-directed brokerage account for additional fees.

37.     The same investment choices have been available to participants of both Plans for investment during the Class Period, including funds managed by Prudential, American Funds, Principal Management, Cohen & Steers, Diamond Hill, Gabelli, John Hancock, Mass Mutual, Metropolitan West, Oppenheimer, Oakmark Funds, T.Rowe Price, Voya, MFS, Vanguard, and Fidelity.

38.     According to the 403(b) Plan's most recently filed Form 5500, as of December 31, 2019 the Plan offered the following investment options to its participants and each fund listed below was entrusted with the stated amount by the Participants as of the date of the Form 5500 filing:

| INVESTMENT OPTION[5] | DECEMBER 2019 $ VALUE |
| --- | --- |
| American Funds Euro-Pacific Growth Fund | 71,828,270 |
| Cohen & Steers Realty Fund | 6,565,068 |
| Diamond Hill Large-Cap Fund | 38,964,202 |
| John Hancock Disciplined Value Mid Cap Fund | 12,969,777 |
| *Gabelli Small Cap Growth Fund Class A | 11,373,445 |
| Metropolitan West Total Return Bond Class M | 99,012,202 |
| Oppenheimer Developing Markets Fund | 19,577,742 |
| Principal High Yield Bonds Fund | 6,062,249 |

---

[5] Asterisks indicate funds that were no longer offered in the Plans for 2020.

| | |
|---|---|
| Principal Mid Cap Blend Fund | 26,543,731 |
| Principal Diversified Real Asset Institutional Fund | 17,935,505 |
| *Voya Small Cap Opportunities Fund | 23,242,496 |
| Oakmark Fund Class I | 44,848,151 |
| MassMutual Sel Mid Growth R5 | 12,607,239 |
| *Vanguard Institutional Index Fund | 84,930,987 |
| *Vanguard Mid-Cap Index Fund | 8,748,851 |
| *Vanguard Small Cap 600 Index | 3,935,140 |
| T. Rowe Price Blue Chip Growth Fund | 79,612,278 |
| Principal Preservation Separate Account (PPSA) | 64,773,668 |
| Prudential IncomeFlex Target Balanced Portfolio | 1,190,730 |
| Self-directed brokerage account | 571,439 |
| | |
| Total | $641,910,461 |

39.     According to the 401(a) Plan's most recently filed Form 5500, as of December 31, 2019, the 401(a) Plan offered the following investment options to its participants and each fund listed below was entrusted with the stated amount by the Participants as of the date of the Form 5500 filing:

| INVESTMENT OPTION | DECEMBER 2019 VALUE |
|---|---|
| American Funds Euro-Pacific Growth Fund | 44,216,954 |
| Cohen & Steers Realty Fund | 7,080,850 |
| Diamond Hill Large-Cap Fund | 29,121,928 |
| *Gabelli Small-Cap Growth A | 4,148,483 |
| John Hancock Disciplined Value Mid Cap Fund | 6,988,420 |
| MassMutual Sel Mid Growth R5 | 7,292,704 |
| Metropolitan West Total Return Bond Class M | 72,126,263 |
| Oppenheimer Developing Markets Fund | 11,206,196 |
| Principal High Yield Bonds Fund | 5,172,627 |
| Principal Mid Cap Blend Fund | 16,499,387 |
| Principal Diversified Real Asset Institutional Fund | 10,578,664 |
| Oakmark Fund Class I | 30,413,156 |
| T. Rowe Price Blue Chip Growth Fund | 49,495,855 |
| *Voya Small Cap Opportunities Fund | 13,034,742 |
| MFS New Discovery Value R6 | 4,987,930 |
| *Vanguard Institutional Index Fund | 3,535,910 |
| *Vanguard Mid-Cap Index Fund | 2,361,093 |
| *Vanguard Small Cap 600 Index | 41,404,934 |
| Principal Preservation Separate Account (PPSA) | 39,502,782 |
| Prudential IncomeFlex Target Balanced Portfolio | 118,710 |
| | |
| Total | $399,287,588 |

40.     In addition to the funds available for investment through the Plans, participants had the ability to choose funds available through GoalMaker. Prudential collected additional fees from Participants who used this advisory service. *See* 403(b) Disclosure, at 8.

**Prudential's GoalMaker Allocation & Kickback Scheme**

41.     Defendants went a step further than merely creating the Plans' investment menus, they included in the Plans and offered participants the ability to invest using Prudential's proprietary asset allocation service called GoalMaker.

42.     GoalMaker is a service that purports to make investments from the Plans' menus for a participant and rebalances them on an ongoing basis. GoalMaker is supposed to guide participants to a model portfolio of investments available, then rebalance accounts quarterly to ensure that portfolios stay on target and GoalMaker's supposed ideal allocations are based on generally accepted financial theories that take into account the historic returns of different asset classes.

43.     The use of an asset allocation service can be a benefit to participant in selecting a portfolio from a plan's investment menu. A retirement investor with limited time or investment experience could benefit from the use of such a resource *if* monitored by a prudent fiduciary that has the participants' best interests in mind. Regrettably, such is not the case with GoalMaker. The opposite is true. GoalMaker is a proverbial wolf in sheep's clothing. It is designed and used to funnel participants into expensive and poorly performing investments.

44.     When retirement investors like Plaintiffs use GoalMaker to manage the investment of his or her retirement plan account, he or she is ceding to Prudential the authority to direct the investment of that account. Prudential then uses GoalMaker to funnel participants into funds that charge excessive fees for Prudential. For example, the Plans' offer participants the ability to invest

in a Vanguard Institutional Index Fund with a net expense ratio of only 0.035%. When a participant uses GoalMaker, and GoalMaker deems it prudent to invest the participants' retirement savings in a Large Cap fund, instead of investing only in Vanguard Institutional Index Fund at 0.035%, it invests participants' retirement savings in Diamond Hill's Large Cap fund with an expense ratio of 0.96%, Oakmark's Large Cap fund with an expense ratio of 0.88%, and T. Rowe Price's Blue Chip Growth Fund with an expense ratio of 0.69%. This example is illustrative. Instead of steering participants into the best and most cost-effective investment options available to them, GoalMaker selected high-cost and poorly performing funds because doing so benefited Prudential.

45.     To make matters worse, Defendants designated GoalMaker as the Qualified Default Investment Option ("QDIA") for the Plans. That means participants' contributions are automatically invested using GoalMaker unless participants actively direct their contributions to be otherwise invested. *See* UMMS Sponsored Retirement Plans Qualified Default Investment Alternative ("QDIA"). As a practical matter, designating GoalMaker as the Plans' QDIA results in plan participants losing millions of dollars in retirement savings.

46.     A significant portion of the Plans' assets were invested through GoalMaker.

47.     While an age-targeted or other rebalancing fund may be a significant benefit to participants *if monitored* by a prudent fiduciary who has the participants' best interests in mind, GoalMaker served Prudential's interests at the expense of the financial interests of the participants by funneling participants' retirement savings into high-priced investments that paid substantial kickbacks to Prudential. Use of GoalMaker was imprudent due to its preference for funds with high expense ratios as compared to other strategies, which would have directed assets to less expensive investment alternatives.

48.     The inclusion and designation of GoalMaker as the QDIA resulted in participants paying excessive investment management fees, administrative expenses, and other costs, which over the Class Period (defined below) cost participants millions of dollars in retirement savings.

49.     Defendants did not have the competence, exercise the diligence, or have in place a viable methodology to monitor the GoalMaker allocation service and investment options. Defendants knew, or should have implemented a prudent investment methodology, such that they became aware that GoalMaker was designed to steer the Plans' participants' retirement savings to investment options that paid investment management fees and kickbacks to Prudential at the expense of the investment returns for the Plans' participants.

50.     ERISA requires fiduciaries not only to act for the *exclusive benefit* of participants and beneficiaries, but also to make *only* prudent investments and to incur *only* reasonable expenses. 29 U.S.C. § 1104(a)(1). "Understanding and evaluating [retirement] plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's responsibility." *Understanding Retirement Plan Fees and Expenses*, U.S. Department of Labor Employee Benefits Security Administration (December 2011).

51.     It is indisputable that the higher the fees charged for an investment the less the investment earns over time. The magnitude of the effect that fees have on the financial performance of retirement accounts is far greater than many realize because of the effect of compounding. The U.S. Department of Labor estimates that over 35 years 1% difference in fees and expenses can reduce a participant's account balance at retirement by as much as 28%. *A Look at 401(k) Plan Fees, 1-2,* U.S. Department of Labor (Aug. 2013).

52.     The differences between fees of 0.25% (25 bps), 0.50% (50 bps), and 1.00% (100 bps) are material, as shown in the following chart published by the SEC.



53.     The most significant expenses for most retirement plans are the investment management fees paid to providers of mutual funds and other investment products. In the case of mutual funds most, but by no means all, investment expenses are reported as "expense ratios." There are other costs (including transaction costs such as commissions, bid-ask spreads, and market impact costs) that are not included in the expense ratio but which reduce investment returns. The expense ratio represents the total of certain of a fund's annual operating expenses expressed as a percentage of the fund's average net assets. Expense ratios are deducted by the mutual fund provider from the investor's returns. Expense ratios often make up as much as 80% of the cost of administering a defined contribution plan.

54.     In retirement investing, *expenses matter*. The logic is simple: for every dollar in costs the returns of an investment shrink by a dollar. The effect is significant, particularly over long periods of time. Research by Morningstar and others, demonstrates overwhelmingly that costs are the most important factor in making prudent investment decisions. As the director of fund

research at Morningstar, Russell Kinnel, noted: "If there's anything in the whole world of mutual funds that you can take to the bank, it's that expense ratios help you make a better decision. In every single time period and data point tested, low-cost funds beat high-cost funds…. Investors should make expense ratios a primary test in fund selection. They are still the most dependable predictor of performance." *Russell Kinnel*, "How Expenses and Stars Predict Success" (Morningstar 2010).

55.     The safest and soundest approach to reducing costs in a retirement plan is to invest in low-cost funds. As Warren E. Buffett advised in a 1996 letter to shareholders, the best way for most investors to control the costs of the management expenses is to maintain an investment menu of low-cost index funds. "Most investors, both institutional and individual, will find the best way to own common stock is through an index fund that charges minimal fees. Those following this path are sure to beat the net results (after fees and expenses) delivered by the great majority of investment professionals."[6]

56.     Funds with higher expense ratios often include additional costs, such as hidden fees such as transaction costs. An ERISA fiduciary who decides to include high fee funds must have a viable methodology for determining that the additional costs are justified by a reasonable prospect of excess returns *net of fees*. A prudent fiduciary must also monitor payments to third parties such as Prudential to prevent the payment of excess fees. As set forth herein, Defendants did not have a viable methodology for implementing such a high-cost strategy.

---

[6] Warren E. Buffett's Letter to the Shareholders of Berkshire Hathaway Inc., (Feb. 28, 1997), available at: https://www.berkshirehathaway.com/letters/1996.html

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and the following proposed class ("Class"):[7]

> All persons who were participants in or beneficiaries of the Plans, at any time between July 22, 2015 and the present (the "Class Period"), excluded from the Class are any fiduciaries to the Plans.

58.     The members of the Class are so numerous that joinder of all members is impractical. According to the Form 5500, as of December 31, 2019, there were 12,183 participants in the 401(a) Plan with account balances at the beginning of the year.

59.     According to the 403(b) Form 5500, as of December 31, 2019, there were 9,625 participants in the 403(b) Plan with account balances at the beginning of the year.

60.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plans and have suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiffs consistently with other Class members and managed each Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

61.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

> (a)     Whether Defendants are fiduciaries of the Plans;

---

[7] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

(b)     Whether Defendants breached their fiduciary duties of prudence by engaging in the conduct described herein;

(c)     Whether Defendants failed to adequately monitor the other fiduciaries to ensure the Plans were being managed in compliance with ERISA;

(d)     The proper form of equitable and injunctive relief; and

(e)     The proper measure of monetary relief.

62.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

63.     This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

64.     In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

**DEFENDANTS' FIDUCIARY STATUS AND FIDUCIARY DUTIES**

65.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

66.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

67.     As described above, Defendants were/are fiduciaries of the Plans because:

    (a)     they were so named; and/or

    (b)     they exercised authority or control respecting management or disposition of the Plans' assets; and/or

    (c)     they exercised discretionary authority or discretionary control respecting management of the Plans; and/or

    (d)     they had discretionary authority or discretionary responsibility in the administration of the Plans.

68.     As a fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plans, and the Plans' investments, solely in the interest of the Plans' participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with

such matters would use in the conduct of an enterprise of a like character and with like aims.  These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

69.     "Thus, in deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment, ***when judged solely on the basis of its economic value to the plan***, would be equal or superior to alternative investments available to the plan." U.S. Dep't of Labor ERISA Adv. Op. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

70.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in  selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio."  *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

71.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") further provides that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable  for  a  breach  of  fiduciary

responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

72.     During the Class Period, Defendants did not act in the best interests of the Plans' participants. Investment fund options chosen for a plan should not favor the fund provider over the Plans' participants. Yet, here, to the detriment of the Plans and their participants and beneficiaries, the Plans' fiduciaries included and retained in the Plans' investment options that charged excessive fees and otherwise were not justified on the basis of their economic value to the Plans.

73.     Defendants failed to have a proper system of review in place to ensure that participants in the Plans were being charged appropriate and reasonable fees for the Plans' investment options. Additionally, Defendants failed to leverage the size of the Plans to negotiate lower fees for certain investment options maintained and/or added to the Plans during the Class Period.

74.     As discussed below, Defendants breached fiduciary duties to the Plans and their participants and beneficiaries and they are liable for their breaches and the breaches of their co-fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## SPECIFIC ALLEGATIONS

### A.     Improper Management of an Employee Retirement Plan Can Cost the Plan's Participants Millions in Savings

75.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing

strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

76.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. B). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[8]

77.     As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

78.     The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.* (footnote omitted).

---

[8]  Available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited July 21, 2021).

79.     Most participants in retirement plans expect that their retirement accounts will be their principal source of income after retirement.

80.     The Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers," and "monitor investment options and service providers once selected to see that they continue to be appropriate choices," among other duties. *A Look at 401(k) Plan Fees*, *supra*.

81.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plan: Services, Fees, and Expenses*, at 4 (July 2016).[9] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id*. at 5.

82.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from companies like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place(s) funds in a given category based on their portfolio statistics and compositions over the past three years."[10]

---

[9] Available at https://www.ici.org/pdf/per23-04.pdf (last visited July 21, 2021).
[10] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited July 21, 2021).

83.     On average, the expense ratios are lower for 401(k) participants than they are for other investors. *See The Economics of Providing 401(k) Plan*, at 11. ERISA-mandated monitoring of investments leads prudent and impartial plan sponsors to continually evaluate performance and fees, resulting in significant competition among mutual funds in the marketplace. Furthermore, the large average account balances of 401(k) plans, especially the largest ones as measured by assets managed, lead to economies of scale and special pricing within mutual funds. *See id* at 10.

84.     This competition has led to falling mutual fund expense ratios for 401(k) plan participants since 2000. In fact, expense ratios for 401(k) participants fell 31 percent from 2000 to 2015 for equity funds, 25 percent for hybrid funds, and 38 percent for bond funds. *See id*. at 1.

85.     Industry analysts have recognized a marked trend toward lower fees in 401(k)s from 2012-2014. *See* Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, THE WALL STREET JOURNAL (May 15, 2016) (noting precipitous drop in overall 401(k) fees from 2012 to 2014).

86.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

### 1.     Passively Managed Funds Cost Less Than Actively Managed Funds

87.     Courts have noted that "an ERISA fiduciary's duty is derived from the common law of trusts." *Tibble*, 135 S. Ct. at 1828 (quotations and citations omitted).  *See also Varity Corp. v. Howe*, 516 U.S. 489, 496-97 (1996) (ERISA "fiduciary duties draw much of their content from the common law of trusts"). Thus, to the extent that ERISA is silent on the appropriate standard for selection and retention of investment options for a plan, courts should seek guidance from trust law.

25

88.     Under the common law of trusts, the determination as to whether the selection of

an investment is appropriate depends on "the type of trustee and the nature of the breach involved,

the availability of relevant data, and other facts and circumstances of the case." Restatement

(Third) of Trusts § 100 cmt. B(1) (2012). The "return rates of one or more suitable common trust

funds, or suitable index mutual funds or market indexes (with such adjustments as may be

appropriate)" is among the relevant factors that fiduciaries should consider. *Id.*

89.     Here, each investment option within the Plans charged certain fees that are paid by

deductions from the pool of assets held by the Plans. For the Plans' passively managed funds,

which are designed to track a market index like the Standard & Poor's 500, securities were

purchased to match the mix of companies within the index. Because passively managed funds are

simply a mirror of an index, these funds offer both diversity of investment and comparatively low

fees.

90.     By contrast, the Plans' actively managed funds, which have a mix of securities

selected by the fund manager based on his or her belief they will beat the market, incur higher fees

to pay the fund managers and their associates for the work associated with stock picking. Often,

these higher fees also pay for the fund's marketing and executive compensation, which provide no

benefits to the Plans.

91.     While higher-cost mutual funds may outperform less-expensive passively managed

index funds in the short term, they rarely do so in the long term. As noted by Jonnelle Marte in

THE WASHINGTON POST, *Do Any Mutual Funds Ever Beat the Market? Hardly* (Mar. 17, 2015), a

study of S&P Dow Jones Indices that analyzed 2,862 actively managed domestic stock mutual

funds over a five-year period, found that "just two funds...managed to hold on to their berths in

the top quarter every year for five years running. And for the 2,862 funds as a whole, that record

is even a little worse than you would have expected from random chance alone."[11] Thus, the funds in the top quartile in performance failed to replicate performance from year to year. *See also Index Funds Trounce Actively Managed Funds: Study* (June 26, 2015) (reporting that data shows that "actively managed funds lagged their passive counterparts across nearly all asset classes, especially over a 10-year period from 2004 to 2014.")[12]

92.    Indeed, funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "*When Cheaper is Better*"); *see also* Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. Pa. L. Rev. 1961, 1967–75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

93.    Here, the Plans have been dominated by expensive, actively managed funds. Out of the nineteen (19) investment options offered as of December 31, 2019, the Plans included only three low-cost passively managed Vanguard index funds. As of 2020, Defendants replaced the Vanguard index fund options with similar Fidelity index fund options.

94.    As shown in the performance chart below, Defendants' decision to select mostly actively managed funds was a poor choice for the Plans because the actively managed funds rarely, if ever, performed any better than far less expensive passively managed index funds that were available in the same fund category and benchmarked to the same market index.

---

[11] Available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutual-funds-ever-beat-the-market-hardly/ (last visited July 21, 2021).
[12] Available at https://www.cnbc.com/2015/06/26/index-funds-trounce-actively-managed-funds-study.html (last visited July 21, 2021).

### 2.   Institutional Share Classes Cost Less Than Investor Share Classes

95.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are sold to individual investors who have less bargaining power, while lower cost shares are sold to institutional investors with more assets, generally $1 million or more, and therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

96.     Large defined contribution Plan such as the Plans have sufficient assets to qualify for the lowest cost share class available. Even when a retirement plan does not meet the investment minimum to qualify for the cheapest available share class, it is well-known among institutional investors that mutual fund companies will typically waive those investment minimums for a large plan willing to add the fund to its menu of designated investment options. Thus, a fiduciary to large defined contribution plan such as the Plans can use their asset size and negotiating power to invest in the cheapest share class available. For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

97.     The availability of lower-cost institutional class shares for large defined benefit Plan has been widely known throughout the Class Period. For instance, a February 2016 article by the head of a fiduciary consulting firm described the failure to investigate the availability of and subsequently utilize the lowest-cost share class as an "egregious fiduciary breach[]" that is responsible for "[w]asting plan assets" in a manner that is "clearly imprudent." Blaine Aikin, *Recent Class-Action Surge Ups the Ante for 401(k) Advice*, INVESTMENTNEWS (Feb. 18, 2016).[13]

---

[13]    Available at: https://www.investmentnews.com/recent-class-action-surge-ups-the-ante-for-401k-advice-66056 (last visited July 21, 2021).

98.     Indeed, a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved … in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately." *Tibble*, 575 U.S. 523 *Int. et al.*, No. 07-5359, slip op. at 13 (C.D. Cal. Aug. 16, 2017).

99.     As one commentator put it, "The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances.  In other words, the 'prevailing circumstances'—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach." Fred Reish, *Just Out of Reish: Classifying Mutual Funds*, PLAN SPONSOR (Jan. 2011).[14]

100.    Thus, it is incumbent upon large plan fiduciaries, like Defendants, to select the lowest-cost class of shares that is available to the Plans.

101.    There have been, throughout the Class Period, lower cost share classes that performed on par with the chosen investment options available for 15 out of 19 investment choices offered to the Plans' participants.

### 3.     Collective Trusts and Separate Accounts Cost Less Than Their Virtually Identical Mutual Fund Counterparts

102.    Throughout the Class Period, the investment options offered within the Plans and

---

[14]  Available at:  https://www.Planponsor.com/magazine/class-ifying-mutual-funds/ (last visited July 21, 2021).

offered to the participants were mostly pooled investment products known as mutual funds.

103.    Plan fiduciaries such as Defendants must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further than mutual funds and provide lower fee alternatives than even institutional and 401(k) plan specific shares of mutual funds. Trust law specifically identifies "one or more suitable common trust funds" as a comparator to determine whether a trust is invested in suitable investments. Restatement (Third) of Trusts § 100 cmt. B(1) (2012).

104.    Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot either advertise or issue formal prospectuses. As a result, their costs are significantly lower, with less or no administrative costs, and less or no marketing or advertising costs. *See* Powell, Robert, *Not Your Normal Nest Egg*, THE WALL STREET JOURNAL, March 2013.

105.    Due to their potential to reduce overall plan costs, collective trusts have become widely popular; *Use of CITs in DC Plan Booming* (discussing data showing that among both mid-size and large defined contribution plan, significantly more assets are held in collective trusts than in mutual funds). Indeed, as of 2012, among plans over $1 billion in size, more assets were held in collective trusts than in mutual funds. *See* Investment Company Institute, *A Close Look at 401(k) Plan*, at 21, 23 (Dec. 2014).[15]

---

[15] Available at The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2014 (pdf) (last visited April 13, 2021).

106.    The criticisms leveled against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts can track the daily performance of their investments online. *See* Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plan*, Employee Benefit News (Apr. 14, 2016) (herein, "CITs Gaining Ground").[16] Many if not most mutual fund strategies are available in collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund. *Id*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors. Also, collective trusts are subject to state and federal banking regulations that provide comparable protections. American Bankers Association, *ABA Primer on Bank Collective Funds*, at 1 (June 2015).[17]

107.    Thus, a prudent fiduciary managing a large plan will give serious consideration to the use of collective trusts, and in the majority of cases, will opt to move out of mutual funds in favor of these investment options.

108.    The Plans did not offer a single collective trust option.[18] Because of the Plans' size, they could have reaped considerable cost savings by using collective trusts, but Defendants again failed to exercise their duty of care.

---

[16] Available at https://www.benefitnews.com/news/cits-gaining-ground-in-401-k-Plan (last visited Oct. 28, 2020).
[17] Available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds (last visited July 21, 2021).
[18] *See*, *e.g.*, 401(a) Form 5500 for 2019, at Schedule H, page 12; 403(b) Form 5500 for 2019, at Schedule H, page 13.

**B.   Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Prudent Share Classes of Funds in the Plans**

109.   The Supreme Court has reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act, treatises, and seminal decisions confirming the duty.

110.   The UPIA, which enshrines trust law, recognizes that the duty of prudent investing applies both to investing and managing trust assets. "[m]anaging embraces monitoring" and that a trustee has "continuing responsibility for oversight of the suitability of the investments already made." *Tibble*, 575 U.S. at 529 (quoting Uniform Prudent Investor Act § 2 (1994)).

111.   Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the Plan's investments are "improvident," or if there is a "superior alternative investment" to any of the Plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

112.   When large plan, like the Plans, have options to select among as many as five classes of shares, there is no loyal or prudent reason to select a more expensive share class of the

fund when the Plans have more than sufficient assets to qualify for the least expensive institutional share class – the higher cost shares are simply more expensive. Defendants had a fiduciary obligation to perform a careful review of each investment option offered by the Plans and determine whether the Plans were availing themselves of the prudent share class of each option.

113.    As demonstrated by the chart below, lower cost share class funds were available for the entirety of the Class Period for the vast majority of the funds Defendants offered in the Plans.

114.    The chart below compares the fund expense ratio of the fund chosen by Defendants against the fund's own lower cost share class in the same investment and demonstrates Defendants (a) had lower cost choices at the time they chose the more expensive share class; and (b) failed to prudently monitor the Plans to determine whether the Plans were invested in prudent share classes available for the Plans' funds.

115.    These more prudent lower-cost share class funds are identical to the in-Plan funds in every way except for their lower cost and comparable or better performance. The chart below calculates the excess expense to the participants caused by selection of the more expensive share classes by Defendants using 2020 expense ratios and 2019 asset totals for the 403(b) Plan, the most recent data available for each.

| In Plan Fund | Expense Ratio[19] | In Plan 10-Year Return | Identical Lower-Cost Share Class | Expense Ratio | Lower-Cost Share Class 10-Year Return | % Fee Excess/ Excess Cost to Participant |
|---|---|---|---|---|---|---|
| REREX American Funds EuroPacific Growth Fund Class R-4 $ 71,828,270 | 0.81% | 7.77% | RERGX American Funds EuroPacific Growth Fund Class R6 | 0.46% | 8.14% | 76% $251,298 |

---

[19] All expense ratios for in Plan funds are from 403(b) Disclosure, Oct. 2020. Expense ratios for alternative funds are from Morningstar.com as of January 2021. 10-Yr. returns for the in-Plan funds and the alternatives are from Morningstar.com as of January 2021.

| | | | | | | |
|---|---|---|---|---|---|---|
| PDRDX<br>Principal Diversified<br>Real Asset Fund<br>Institutional Class<br>$17,935,505 | 0.96% | questions | PDXDX<br>Principal Diversified Real<br>Asset Fund R6 | 0.79% | 5.17% | 22%<br><br>$30,490.59 |
| CPHYX<br>Principal High Yield<br>Fund Class A<br>$ 6,062,249 | 0.94% | 6.00% | PHYFX<br>Principal High Yield Fund<br>Class R6 | 0.54% | 6.16% | 74%<br><br>$24,249.00 |
| PEMGX<br>Principal Mid Cap Fund<br>Class A<br>$ 26,543,731 | 0.98% | 15.28% | PCBIX<br>Principal Mid Cap Fund Instit. | 0.70% | 15.66% | 40%<br><br>$74,322.44 |
| MWTRX<br>Metropolitan West Total<br>Return Bond Fund<br>Class M<br>$99,012,202 | 0.67% | 4.49% | MWTIX<br>Metropolitan West Total<br>Return Bond Fund Class I | 0.46% | 4.74% | 46%<br><br>$207,925.62 |
| JVMSX<br>John Hancock Funds<br>Disciplined Value Mid<br>Cap<br>Fund Class R2<br>$12,969,777 | 1.27% | 11.24% | JDVWX<br>John Hancock Funds<br>Disciplined Value Mid Cap<br>Fund Class R6 | 0.75% | 11.75% | 67%<br><br>$63,975.74 |
| GCASX<br>Gabelli Small Cap Gr.<br>Fund Class A<br>$11,373,445 | 1.4% | 9.69% | GACIX<br>Gabelli Small Cap Growth<br>Fund Class I | 1.15% | 9.96% | 22%<br><br>$28,433.61 |
| NSPAX<br>Voya Small Cap<br>Opportunities Fund A<br>$23,242,496 | 1.37% | 11.05% | IVSOX<br>Voya Small Cap Opportunities<br>R6 | 0.91% | 11.07% | 50%<br><br>$106,915.49 |
| CSRSX<br>Cohen & Steers Realty<br>Shares Fund Class L<br>$6,565,068 | 0.89% | 9.25% | CSRIX<br>Cohen & Steers Inst. Realty<br>Shares | 0.75% | 9.47% | 19%<br><br>$9,191.11 |
| ODMAX<br>Invesco Oppenheimer<br>Developing Markets<br>Fund<br>Class A<br>$19,577,742 | 1.24% | 4.90% | ODVIX<br>Invesco Oppenheimer<br>Developing Markets Fund<br>Class R6 | 0.83% | 5.31% | 49%<br><br>$80,268.74 |
| WGRSX<br>Wasatch Core Growth<br>Fund<br>(new for 2020) | 1.19% | 15.80% | WIGRX<br>Wasatch Core Growth Fund<br>Inst. | 1.05% | 15.91% | 13%<br><br>unknown |

| | | | | | | |
|---|---|---|---|---|---|---|
| DHLAX<br>Diamond Hill Large-Cap Fund Class A<br>$38,964,202 | 0.96% | 11.71% | DHRLX<br>Diamond Hill Large-Cap Fund Class I | 0.67% | 12.02% | 43%<br><br>$128,581.87 |
| OAKMX<br>Oakmark Fund Investor Class<br>$44,848,151 | 0.92% | 12.50% | Oakmark R6 | 0.63% | 12.50% | 46%<br><br>$130,059.64 |
| TRBCX<br>T. Rowe Price Blue Chip Growth Fund<br>$79,612,278 | 0.69% | 17.67% | TBCIX<br>T. Rowe Price Blue Chip Growth Fund Investor | 0.56% | 17.75% | 23%<br><br>$103,495.96 |
| MGRFX<br>MassMutual Select Mid Cap Growth Fund Class R5<br>$12,607,239 | 0.81% | 14.56% | MassMutual Select Mid Cap Growth Fund Class I | 0.71% | 14.69% | 14%<br><br>$12,607.24 |

116.     For just one of the two Plans, for one year of the Class Period, participants paid out more than $146,970.34 for excess fees.

117.     The information for these lower-cost share classes is publicly available and Defendants should have known of the existence and availability of these cheaper share classes.

118.     Qualifying for lower share classes often requires only a minimum investment of $1 million for an individual fund. As demonstrated in the tables above, each of the funds had more than $2 million in assets, and therefore, the Plans would have easily qualified for lower share classes for these funds.

119.     A prudent fiduciary conducting an impartial review of the Plans' investments would have identified the cheaper share classes available, chosen that cheaper share class initially, and/or transferred the Plans' investments in the more expensive referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not choose the most appropriate funds or transfer Plan holdings in any of these funds into the lowest-cost institutional shares, in breach of their fiduciary duties.

120.    Defendants' failures to select the lowest cost share class available caused Plan participants to pay excessive fees, which has diminished and will continue to diminish the value of their individual defined contribution accounts.

121.    For example, both Plans had significant assets invested in the American Funds Euro-Pacific Growth R4. For the year ending 2019, the 403(b) Plan had $71,828,270 invested in this fund, generating $581,808.99 in fees, taken out of the potential profits of the participants, to American Funds.

122.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment. The Plans did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

123.    While the higher-cost share classes may have enabled the Plans to defray some of the administrative costs of the Plans through revenue sharing, as explained below, the value of the administrative costs that could have been defrayed do not outweigh the excessive payments made to Prudential and/or the opportunity cost to Plaintiffs of investing that money rather than paying it to Prudential.

**C.    Defendants Breached Their Fiduciary Duties in Failing to Investigate and Select Lower Cost Alternative Funds**

124.    Defendants selected and retained several actively managed funds as Plan investment options despite the fact that these funds charged grossly excessive fees compared with comparable or superior alternatives, and despite ample evidence available to a reasonable fiduciary that investment in these funds was imprudent due to their high costs.

125.    During the Class Period, the Plans lost millions of dollars by offering investment options that had similar, if not identical, characteristics to other lower-priced investment options, but had much higher expenses.

126.    Using services that are readily available to ERISA fiduciaries to analyze the current Plans' offerings, as reported in the Form 5500 for the year ended December 31, 2019, 15 out of the 19 funds in the Plan – 79*%* of the funds – were significantly more expensive than comparable funds found in similarly-sized Plans (Plans having $300+ million in assets). The expense ratios for funds in the Plans range from 15-3000% greater than the expense ratio for comparable funds available to the Plans. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A Close Look at 401(k) Plan, 2015*, at 69  (March 2018) (hereafter, "ICI Study").[20]

**D.    Defendants Imprudently Chose Historically Underperforming Investments**

127.    Given Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plans' investments, numerous investment options underperformed both benchmarks and lower-cost alternative investments that were available to the Plans for their fund categories.

128.    Prudent fiduciaries of large defined contribution plans must regularly analyze the plan's investment options to determine whether its actively managed funds will outperform benchmarks, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class.

129.    Defendants failed to undertake such analyses when they selected and retained the actively managed funds in the chart, below. Defendants provided these fund options without

---

[20] *See* https://www.ici.org/pdf/ppr_18_dcplan_profile_401k.pdf.

conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

130.    Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds in the chart below underperformed their respective fund categories' benchmarks over extended periods.

131.    Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plans' investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct itself within a reasonable period of time.

132.    The following performance charts compare the investment returns of certain of the Plans' investments that were available to Participants during the 2019 and 2020 plan years to substantially similar funds that are in the same Morningstar fund category and use the same benchmark index (most of which have at least 90 percent similar holdings), but have significantly lower net expense ratio to benchmarks in their funds' categories for the one-, three-, five- and ten-year periods ending March 31, 2020. Each of the "Low-Fee Alternatives" in the chart are assigned by Morningstar to the same fund category as the "In Plan Option" to which they are compared, and each of the "Low-Fee Alternatives" are benchmarked by Morningstar to the exact same market index as the "In-Plan Option". The applicable benchmark for both the "In-Plan Option" and the

"Low Fee Alternatives" is set forth under the name of the "In Plan" option. The information on

this chart shows the Plans' investment options under-performed the lower cost alternatives.

### THE PLANS' INVESTMENT OPTIONS UNDERPERFORMED BENCHMARKS AND LOWER-COST ALTERNATIVES

| IN PLAN OPTION | Net Expense Ratio[21] | Average Annual Return (%) | | | | Benchmark Relative (%) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| REREX $71,828,270[22] American Funds EuroPacific Growth Fund Class R-4 *Benchmark: MSCI ACWI Ex USA Growth NR USD* | 0.81% | 24.81 | 10.35 | 12.08 | 7.77 | 2.61 | 0.33 | 0.10 | 0.83 |
| LOW-FEE ALTERNATIVES[23] | | | | | | | | | |
| RERGX American Funds EuroPacific Growth Fund Class R6 | 0.46% | 25.27 | 10.74 | 12.47 | 8.14 | 3.06 | 0.72 | 0.49 | 1.21 |
| VWIGX Vanguard International Growth Inv | 0.44% | 59.55 | 22.31 | 21.62 | 12.25 | 37.35 | 12.29 | 9.65 | 5.31 |

---

[21] ERs for in Plan funds are taken from the *Fee Disclosure,* October 2020.
[22] Asset values for funds are as of December 21, 2019.
[23] Alternatives are as reported on Morningstar.com as of January 2021.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Benchmark Relative | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| PDRDX $17,935,505 **Principal Diversified Real Asset Fund Institutional Class** *Benchmark: Morningstar Gbl Allocation TR* as of 1/7/2021 | 0.96% | 3.97 | 3.27 2.77% | 5.13 | 2.81 2.64% | -9.57 | -5.05 | -4.62 | -4.40 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| PDARX Principal Diversified Real Asset Fund R6 | 0.79% | 3.94 | 3.30 | 5.17 | 2.83 | -9.61 | -5.02 | -4.59 | -4.39 |
| RGBGX American Funds Global Balanced R6 | 0.49% | 10.87 | 7.10 | 8.44 | ___ | -2.68 | -1.22 | -1.32 | ___ |
| CAIBX American Funds Capital Income Bldr A | 0.61% | 3.27 | 4.06 | 6.60 | 6.53 | -10.27 | -4.26 | -3.16 | -0.69 |
| VGWAX Vanguard Global Wellington Admiral | 0.34% | 7.51 | 7.76 | --- | ----- | -6.04 | -0.56 | --- | --- |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| CPHYX $6,062,249 **Principal High Yield Fund Class A** *Benchmark: ICE BofA US High Yield TR USD* | 0.94% | 6.08 | 4.59 | 7.16 | 6.00 | -0.09 | -1.29 | -1.27 | -0.63 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| PHYFX Principal High Yield Fund Class R-6 | 0.54% | 6.52 | 5.09 | 7.50 | 6.16 | 0.35 | -0.79 | -0.93 | -0.46 |
| LSOIX Loomis Sayles High Income Opps Inst. | 0.00%[24] | 9.24 | 6.53 | 8.71 | 7.42 | 3.08 | 0.64 | 0.27 | 0.80 |
| BRHYX BlackRock High Yield Bond K | 0.51% | 5.93 | 5.98 | 8.01 | 6.80 | -0.24 | 0.10 | -0.42 | 0.18 |
| TRHYX T. Rowe Price Inst. High Yield | 0.50% | 4.09 | 5.31 | 7.82 | 6.33 | -1.27 | -0.58 | -0.61 | -0.30 |

[24] Fund charges a wrap fee.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| PEMGX $26,543,731 **Principal Mid Cap Fund Class A** *Benchmark: Russell Mid Cap Growth TR* | 0.98% | 17.96 | 16.08 | 16.52 | 15.28 | -17.63 | -4.41 | -2.13 | 0.24 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| PCBIX Principal Mid Cap Fund Inst. | 0.70% | 18.26 | 16.40 | 16.85 | 15.66 | -17.33 | -4.10 | -1.80 | 0.62 |
| IRGJX Voya Russell Mid Cap Gr. Idx Port I | 0.40% | 34.84 | 19.93 | 18.16 | 14.62 | -0.75 | -0.56 | -0.50 | -0.42 |
| CMGIX BlackRock Mid-Cap Growth Equity Inst. | 0.80% | 46.13 | 26.98 | 23.22 | 17.74 | 10.55 | 6.48 | 4.56 | 2.69 |
| VRGWX Vanguard Mid Cap Growth Index I | 0.07% | 38.38 | 22.90 | 20.92 | 17.11 | -0.11 | -0.09 | -0.08 | -0.10 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| *MWTRX $99,012,202* **Metropolitan West Total Return Bond Fund Class M** *Benchmark: BBgBarc US Universal TR USD* | 0.67% | 8.79 | 5.80 | 4.56 | 4.49 | 1.21 | 0.35 | -0.32 | 0.33 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| *MWTIX* Metropolitan West Total Return Bond Fund Class I | 0.46% | 9.13 | 6.04 | 4.79 | 4.74 | 1.55 | 0.59 | -0.08 | 0.57 |
| *MPHQX* BlackRock Total Return K | 0.38% | 9.08 | 5.94 | 5.12 | 4.87 | 1.51 | 0.48 | 0.25 | 0.71 |
| *DODIX* Dodge & Cox Income | 0.42% | 9.45 | 6.19 | 5.71 | 4.65 | 1.88 | 0.73 | 0.84 | 0.48 |
| *FTBFX* Fidelity® Total Bond Fund | 0.45% | 9.33 | 6.06 | 5.64 | 4.60 | 1.76 | 0.60 | 0.77 | 0.43 |
| *WACPX* Western Asset Core Plus Bond I | 0.45% | 9.39 | 6.06 | 5.64 | 4.60 | 1.81 | 1.10 | 1.41 | 1.25 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| JVMSX $12,969,777<br>John Hancock Funds Disciplined Value Mid Cap Fund Class R2<br>*Benchmark: Russell Mid Cap Value TR USD* | 1.27% | 5.52 | 5.12 | 8.96 | 11.24 | 0.55 | -0.24 | -0.78 | 0.75 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| JDVWX<br>John Hancock Funds Disciplined Value Mid Cap Fund Class R6 | 0.75% | 6.01 | 5.66 | 9.50 | 11.75 | 1.04 | 0.29 | -0.24 | 1.26 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| CSRSX $6,565,068<br>Cohen & Steers Realty Shares Fund Class L<br>*Benchmark: S&P United States REIT TR USD* | 0.89% | -2.88 | 7.34 | 6.94 | 9.25 | 4.64 | 3.88 | 2.32 | 1.07 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| CSRIX<br>Cohen & Steers Inst. Realty Shares | 0.75% | -2.57 | 7.55 | 7.20 | 9.47 | 4.95 | 4.10 | 2.58 | 1.30 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| ODMAX $19,577,742<br>Invesco Oppenheimer Developing Markets Fund Class A<br>*Benchmark: MSCI EM NR USD* | 1.24% | 17.22 | 8.49 | 12.97 | 4.90 | -1.08 | 2.32 | 0.16 | 1.28 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| ODVIX<br>Invesco Oppenheimer Developing Markets Fund Class R6 | 0.83% | 17.66 | 8.93 | 13.43 | 5.31 | -0.65 | 2.75 | 0.62 | 1.69 |
| NEWFX<br>American Funds New World A | 1.00% | 24.79 | 11.75 | 13.95 | 7.00 | 6.48 | 5.57 | 1.14 | 3.37 |
| MADCX<br>BlackRock Emerging Mkts Inst. | 0.88% | 24.53 | 12.03 | 16.76 | 5.45 | 6.63 | 6.34 | 5.01 | 1.82 |
| FIMKX<br>Fidelity Advisor® Emerging Markets I | 1.06% | 30.41 | 11.47 | 16.03 | 6.06 | 12.10 | 5.30 | 3.22 | 2.43 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| DHLAX $38,964,202<br>Diamond Hill Large-Cap Fund Class A<br>*Benchmark: Russell 1000 Value TR USD* | 0.96% | 8.65 | 8.87 | 12.08 | 11.71 | 5.86 | 2.8 | 2.34 | 1.21 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| DHRLX<br>Diamond Hill Large-Cap Fund Class I | 0.67% | 8.97 | 9.18 | 12.41 | 12.02 | 6.17 | 3.12 | 2.67 | 1.51 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| OAKMX $44,848,151<br>**Oakmark Fund Investor Class**<br>*Benchmark: Russell 1000 TR USD* | 0.92% | 12.90 | 7.75 | 12.40 | 12.50 | -8.07 | -7.07 | -3.20 | -1.50 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| OAZMX<br>Oakmark R6 (yes, it's the same perf.) | 0.63% | 12.90 | 7.75 | 12.40 | 12.50 | -8.07 | -7.07 | -3.20 | -1.50 |
| FXAIX<br>Fidelity® 500 Index | 0.02% | 18.40 | 14.17 | 15.21 | 13.87 | -2.57 | -0.65 | -0.39 | 0.14 |
| SWTSX<br>Schwab Total Stock Market Index | 0.03% | 20.71 | 14.37 | 15.32 | 13.72 | -0.25 | -0.44 | -0.28 | -0.29 |
| VINIX<br>Vanguard Institutional Index I | 0.035% | 18.39 | 14.15 | 15.19 | 13.86 | -2.57 | -0.66 | -0.41 | -0.15 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| TRBCX $79,612,278<br>**T. Rowe Price Blue Chip Growth Fund**<br>*Benchmark: Russell 1000 Growth TR USD* | 0.69% | 34.73 | 21.33 | 19.76 | 17.67 | -3.76 | -1.65 | -1.24 | 0.46 |
| LOW-FEE ALTERNATIVES | | | | | | | | | |
| TBCIX<br>T. Rowe Price Blue Chip Growth Fund Investor | 0.56% | 34.90 | 21.49 | 19.91 | 17.75 | -3.59 | -1.50 | -1.09 | 0.54 |

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| MGRFX $12,607,239 **MassMutual Select Mid Cap Growth Fund Class R5** *Benchmark:* | 0.81% | 26.12 | 17.25 | 16.32 | 14.56 | -9.47 | -3.25 | -2.33 | -0.48 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| MEFZX MassMutual Select Mid Cap Growth Fund Class I | 0.71% | 26.20 | 17.37 | 16.44 | 14.69 | -9.39 | -3.13 | -2.22 | -0.36 |
| PRIMECAP Odyssey Aggressive Growth | 0.64% | 29.00 | 14.03 | 17.22 | 17.56 | -6.59 | -6.47 | -1.44 | 2.54 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| NSPAX $23,242,496 Voya Small Cap Opportunities Fund A *Benchmark:* Russell 2000 Gr. | 1.37% | 25.99 | 9.57 | 11.78 | 11.05 | -8.64 | -6.62 | -4.59 | -2.44 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| IVSOX Voya Small Cap Opportunities Fund R6 | 0.91% | 26.36 | 10.14 | 12.46 | 11.07 | -8.28 | -6.05 | -3.90 | -1.72 |
| PRDSX T. Rowe Price QM US Small-Cap Gr Eq | 0.79% | 23.84 | 15.26 | 15.79 | 14.40 | -10.79 | -0.93 | -0.57 | 0.91 |
| PSGIX BlackRock Advantage Small Cap Gr Inst. | 0.50% | 33.40 | 19.25 | 17.18 | 13.41 | -1.24 | 3.05 | 0.82 | -0.08 |
| VISGX Vanguard Small Cap Growth Index Inv | 0.19% | 35.12 | 10.06 | 17.85 | 13.88 | 0.49 | 2.87 | 1.49 | 0.40 |
| IN PLAN OPTION | Net Expense Ratio | Average Annual Return | | | | Performance Relative to Benchmark | | | |
| | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| GCASX $11,373,445 Gabelli Small Cap Growth Fund Class A *Benchmark: Russell 2000 TR USD* | 1.4% | 13.71 | 5.38 | 10.29 | 9.69 | -6.25 | -4.87 | -2.97 | -1.52 |
| **LOW-FEE ALTERNATIVES** | | | | | | | | | |
| GACIX Gabelli Small Cap Growth Fund Class I | 1.15% | 13.98 | 5.64 | 10.57 | 9.96 | -5.98 | -4.60 | -2.61 | -1.24 |
| DFSTX DFA US Small Cap I | 0.35% | 11.17 | 5.55 | 10.13 | 10.31 | -8.79 | -4.70 | -3.13 | -0.89 |
| PRSVX T. Rowe Price Small-Cap Value | 0.83% | 12.50 | 7.81 | 12.87 | 10.51 | -7.46 | -2.44 | -0.39 | -0.69 |
| NAESX Vanguard Small Cap Index Inv | 0.17% | 18.96 | 11.08 | 13.47 | 11.86 | -1.00 | 0.84 | 0.21 | 0.66 |

133.    A reasonable investigation by the Plans' fiduciaries would have revealed the existence of the comparable alternative funds listed above.

134.    For example, the Plans offered the American Funds EuroPacific Growth Fund Class R-4, which has an expense ratio of 0.81% and Plan participants invested more than 10% of their savings in this fund. This fund offers a lower cost share class, the R-6, with an expense ratio of 0.46% A search in the marketplace also reveals the availability of other lower cost alternative funds, such as the Vanguard International Growth Inv., with an expense ratio of 0.44%.

135.    Defendants cannot justify their selection and retention of the American Funds EuroPacific Growth Fund Class R-4 on the basis that the performance of this fund has been superior to the lower cost investment options. On the contrary, during the Class Period, both American Funds lower cost share class and the far less expensive Vanguard fund outperformed the American Funds EuroPacific Growth Fund Class R-4 for 1Y, 3Y, 5Y AND 10Y benchmarks measured on a quarterly basis. Indeed, the Vanguard fund trounced the American Funds EuroPacific Growth Fund Class R-4.

136.    Another example of imprudent investment choices that easily could have been changed is the Plans' offer of three Principal funds, the Principal High Yield Fund Class A (expense ratio of 0.94%), Principal Diversified Real Asset Institutional Fund (expense ratio of 0.84%) and the Principal Mid Cap Fund Class A (ER of 0.98%). Approximately 8% of the participants' savings were invested in these three funds.

137.    All three of these funds are offered in lower cost share classes, either an R-6 (for the High Yield, 0.54% expense ratio, Diversified Real Estate, 0.79% expense ratio) or an Institutional class (for the Mid Cap, 0.70% expense ratio). The marketplace also has plenty of less expensive alternatives measured against the same benchmarks. For example, the Vanguard Mid

Cap Growth Index, which has an expense ratio of 0.07%, is a lower cost alternative for the Principal Mid Cap Fund Class A.

138.    Defendants cannot justify their selection and retention of the Principal investments on the basis that the performance of those funds has been superior to the lower cost investment options. On the contrary, during the Class Period, the less expensive investment options perform as well as the more expensive funds selected for the Plans. For example, the far less expensive Vanguard Mid Cap Growth Index fund put to shame the Principal Mid Cap Fund Class A for 1Y, 3Y, 5Y and 10Y performance measures on a quarterly basis.

139.    As shown in the table above, the Invesco Oppenheimer Developing Markets Class A, which has an expense ratio of 1.24%, is outperformed by at least four other funds for a decade, one of which is its own lower cost share class, an R6, with an expense ratio of 0.83%. All of the alternative funds outperformed the Invesco Oppenheimer Developing Markets Class A. Accordingly, Defendants' selection and retention of the Invesco Oppenheimer Developing Markets Class A, despite the abundance of superior options that were readily available to the Plans, is strong evidence of a flawed fiduciary process and breach of Defendants' fiduciary duties.

140.    Defendants' selection and retention of the Oakmark Fund Investor Class, into which approximately 7% of the participants' savings was invested, is also strong evidence of a flawed fiduciary process and breach of Defendants' fiduciary duties. The Oakmark Fund Investor Class has an expense ratio of 0.92%, but is also offered in a lower cost share class, an R6, with an expense ratio of 0.63%, with the exact same performance over a 10-year period.

141.    The prudent share classes of these funds would have provided superior returns for investors. Furthermore, for each of these funds, there were alternative investments that were less costly than even the lowest-cost share class of such funds and performed far better than either the

in-Plan fund or the lowest-cost share class of the in-Plan fund. Accordingly, Defendants' selection and retention of these funds, despite the abundance of readily available, superior options, is strong evidence of a flawed fiduciary process and a breach of Defendants' fiduciary duties.

142.   In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to rigorously evaluate the funds before selection, failed to monitor the funds in the chart above, and retained these funds despite their continuing underperformance compared to the benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plans for each of these investments.

143.   Prudent fiduciaries of a defined contribution plan must evaluate investments before selection and then continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the funds in the chart above would have been removed from the Plans.

144.   Had the Defendants removed these funds from the Plans and the amounts been invested in any of the prudent alternatives identified herein, participants in the Plans would not have lost millions of dollars of retirement savings.

### E.   Defendants Offered Only One Stable Value Fund Which Was Under-Performing and Expensive and Defendants Allowed GoalMaker to Place Substantial Percentages of Holdings into This Sub-Par Stable Value Fund

145.   Stable value funds are a staple of defined contribution plans. They provide liquidity, principal protection and consistent returns over time.

146.    Stable value funds are intended to provide the liquidity and principal protection of a money market fund, but with higher returns that are closer to short-intermediate bond funds.

147.    Stable value funds are able to generate these higher returns because 401(k) participant behavior provides a stable amount of money to be invested in the account over time. This enables funds providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by guaranteeing the funds transacts at face value. Stable value funds also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with bond funds. *See Miller v. AutoZone, Inc.*, No. 2:19-cv-02779-MSN-tmp, 2020 WL 6479564 at *5 (W.D. Tenn. Sept. 18, 2020).

148.    In most cases, stable value products use a guaranteed investment contracts, also known as "GICS" or "wraps" that have specialized risk and return characteristics.[25] In the vast majority of cases, stable value funds are not mutual funds and are typically structured as: (1) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic account.

149.    Large plans often offer synthetic accounts, which are the least risky because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds.[26]

150.    Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As

---

[25] *See* https://stablevalue.org/knowledge/faqs/question/what-are-gics-and-wraps
[26] Stable value funds invest in fixed-income securities and wrap contracts offered by banks and insurance companies. Wrap contracts guarantee a certain return even if the underlying investments decline in value. To support that guarantee, a wrap contract relied on both the value of the associated assets and the financial backing of the wrap provider.

a result, they offer higher crediting rates. Separate account products, such as the Prudential PPSA, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently must offer the highest rates.

151.    Following the high-profile failure or near failure of a number of stable value providers during the credit crisis of 2008-09, the trend among fiduciaries is to avoid general account stable value funds because of credit risk concerns.

152.    During the Class Period, the Plans offered one stable value product, Prudential's Principal Preservation Separate Account ("PPSA").

153.    The Prudential PPSA is a general account product established pursuant to a contract between UMMS and Prudential. The invested funds are deposited by Prudential into its general account.

154.    Thus, the Prudential PPSA is subject to a single entity credit risk, of Prudential, the issuer of the contract.

155.    The crediting rate – set in advance by Prudential at its sole discretion – is not tied to the performance of the assets deposited into the PPSA.

156.    Because the crediting rate is set in advance, Defendants have both the opportunity and the duty to evaluate this investment in advance.

157.    The fact that the funds are deposited into Prudential's general account enables Prudential to earn a "spread" equal to the difference between the crediting rate and the returns earned by Prudential from the general account funds.

158.    Because the funds deposited into the PPSA are deposited into a general account by Prudential, Prudential earns a "spread" equal to the difference between the 1.00-1.5% crediting rate and the returns earned by the general account funds.

159.   Defendants do not require Prudential to provide information regarding the performance of the general account into which the participants' funds were invested.

160.   In addition, Defendants do not require Prudential to disclose the "Spread" to either the Plans or to the participants.

161.   Thus, upon information and belief, neither Defendants nor the participants know the "spread" being collected by Prudential.

162.   Upon information and belief, the spread was consistently 200 basis points or more.

163.   Upon information and belief, Prudential is collecting, and participants are paying, a 200+ basis point fee to obtain a return of 1.00-1.5% on their investments.

164.   In addition to the spread, the PPSA "has an asset charge of 0.10% collected for recordkeeping services. Investment management fees may also apply. The crediting rate shown is net of these fees." *See* 403(b) Disclosure at 5.

165.   Defendants had the duty to monitor the fees and investment performance of this PPSA investment year over year.

166.   Upon information and belief, the spread collected by Prudential was a windfall.

167.   The PPSA is permitted by contract to pay a return as low as 1% ("crediting rate"). *403(b) Disclosure*, at 5.

168.   This investment return by the PPSA is approximately *50-75% below* the return provided by other stable value funds widely available in the marketplace.

| IN PLAN OPTION | Net Expense Ratio | Average Annual Return Net of Fees | | | |
|---|---|---|---|---|---|
| | | 1Y | 3Y | 5Y | 10Y |
| Principal Preservation Separate Account | 0.10% | 1.5% | | | |

| LOWER-FEE/HIGHER RETURN ALTERNATIVES | | | | | |
|---|---|---|---|---|---|
| Prudential Stable Value Fund[27] | 0.29% | 2.50% | 2.36% | 2.49% | ----- |
| Invesco Stable Value Trust –Class A1[28] | 0.33% | 2.29% | 2.36% | 2.15% | 1.98% |
| Vanguard Retirement Savings Trust[29] | 0.30% | 4.5% | 4.30% | 4.22% | 3.14% |
| Putnam Stable Value Fund[30] | 0.25% | 2.43% | 2.38% | 2.16% | 2.16% |
| Hueler Stable Value Pooled Fund Universe Average.[31] | ----- | 2.50% | 2.30 % | 2.10% | 2.20 % |

169.     As shown on the chart above, Prudential offered to the marketplace at least one other stable value fund, which has substantially similar terms to the PPSA. For example, this Prudential Stable Value Fund also offers crediting rates set and guaranteed by Prudential six months in advance, which is net of fund management fees. However, the Prudential Stable Value Fund provides a substantially higher return. *See* Chart, above. The current crediting rate for the Prudential Stable Value Fund is 2.44%, which is 0.94 bps higher than the crediting rate for the PPSA.

170.     It is also interesting to note that although the publicly available fund fact sheet for the Prudential Stable Value Fund states the current crediting rate, the publicly available fund fact sheet for the PPSA does not state the current crediting rate.

---

[27] Prudential Stable Value Fund Fact Sheet, 1stQ 2020. Prudential Stable Value Fund.
[28] Per Invesco Fact Sheet as of 9/30/2020.
[29] Vanguard - Stable value strategies. Values as of 9/30/2020. last visited July 21, 2021
[30] Values as of 12/31/2020.
[31] Available at:
https://institutional.vanguard.com/VGApp/iip/site/institutional/investments/StableValue. (last visited July 21, 2021).

171.    Underperformance of a plan's investment choices, especially when considering investments earning 1.5% versus 2.5% can have a dramatic effect on the accumulation of an individual's retirement savings. A difference of 100 basis points, or one percent, is significant in this regard.

172.    For example, as of December 31, 2019, combined assets for the Plans of $104,276,450 were invested in the PPSA. Calculated at an annual rate of 1.5%, those assets earned approximately $1,564,146. If those assets had been credited 2.5%, they would have earned an annual return of approximately $2,606,911.

173.    Defendants' 403(b) Disclosure fails to provide benchmark information for the PPSA. As a result, participants cannot evaluate the performance of the PPSA relative to other stable value funds that are available in the marketplace.

174.    The PPSA is not described in the SPD. *See*, *e.g.*, 403(b) Jan. 1, 2019 SPD.

175.    The 403(b) Disclosure provides the following information, in pertinent part:

The Principal Preservation Separate Account is a group annuity product issued by Prudential Retirement Insurance and Annuity Company (PRIAC), Hartford, CT. Amounts contributed to the contract are deposited into a separate account established by PRIAC. Payment obligations and the fulfillment of any guarantees specified in the group annuity contract are insurance claims supported by assets in the separate account and, if such assets are not sufficient, by the full faith and credit of PRIAC. PRIAC periodically resets the interest rate credited on contract balances, subject to a minimum rate specified in the group annuity contract. Past interest rates are not indicative of future rates.... Prudential Retirement may earn fee revenue plus the foregoing compensation if your plan has agreed to pay contract charges--which are sometimes paid with respect to plan/participant recordkeeping and distribution services. For some plans, Prudential Retirement uses a portion of its aggregate compensation to satisfy the plan's request for allowances and for payments to defray plan expenses. If Prudential Retirement's aggregate compensation from this and other plan investment products exceeds the costs of servicing your plan, Prudential Retirement earns a profit otherwise, there is a loss.

176.    Approximately 10% of the 401(a) Plan and 10% of the 403(b) Plan was/is invested in the PPSA throughout the Class Period. *See* 403(b) Forms 5500 for 2015-2019 at Schedule H;

401(a) Forms 5500 for 2015-2019 at Schedule H. For example, for the year ended December 31, 2019, $64,773,668 of the 403(b) Plan was invested in the PPSA.

177.    A prudent fiduciary would have monitored the investment, understood the pricing mechanism, and informed itself regarding reasonable market rate crediting rates and spread fees.

178.    A prudent fiduciary would have learned that the PPSA was under-performing and divested the Plans of the PPSA.

**F.    UMMC Failed to Monitor or Control the Plans' Recordkeeping and Other Administrative Expenses**

179.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures, self-directed brokerage accounts, investment consulting, and general consulting services. Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

180.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

181.    According to a study conducted by Deloitte Consulting LLP for the Investment Company Institute, on average, administrative expenses – the largest of which, by far, is recordkeeping – make up 18% of total plan fees. *See Inside the Structure of Defined Contribution/401(k) Plan Fees, 2013: A study assessing the mechanics of the 'all-in' fee*, at 17 (Aug. 2014) (stating: "recordkeeping, administrative and financial advice fees made up 18% of total fees").[32]

182.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.  Because recordkeeping expenses are driven by the number of participants in a plan, the majority of plans are charged on a per-participant basis.

183.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

184.    It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011)

---

[32]Available at https://www2.deloitte.com/content/dam/Deloitte/us/Documents/human-capital/us-cons-401k-fee-study-2013-082014.pdf (last visited July 21, 2021).

(explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

185.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

186.    Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

187.    Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plan experiences an increase in recordkeeping costs or fee benchmarking reveals the

recordkeeper's compensation to exceed levels found in other, similar plans. *George*, 641 F.3d at 800; *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

188.   Defendants have failed to prudently manage and control the Plans' recordkeeping and administrative expenses by failing to undertake any of the aforementioned steps because, among other things, there is no evidence that Defendants negotiated to lower recordkeeping costs. The total amount of recordkeeping fees paid throughout the Class Period on a per participant basis was excessive and unreasonable.

189.   According to both Plans' financial statements filed with the Department of Labor on Form 5500, participants paid to Prudential both disclosed direct payments for recordkeeping services and *undisclosed* payments for recordkeeping services.

190.   Specifically, the Plan paid substantial amounts through revenue sharing arrangements with the various fund families through which the Plans offer investment options. *See* Form 5500 for 2019, Schedule C (reporting only that Prudential received indirect compensation without disclosing the amounts of such compensation). Defendants have breached their fiduciary duties of prudence by allowing third-parties to pocket excessive fees from throughout the Class Period.

191.   In recent defined contribution plan excessive fee litigation, *Ramos v. Banner Health*, 2020 WL 2553705 (D. Colo. May 20, 2020) (bench trial), the Court found it "highly significant" that the defendant went nearly twenty years without soliciting competitive bids for recordkeeping services through a request for proposal. The Court also agreed with plan participants that the plan's prior recordkeeping arrangement—in which the plan paid uncapped, asset-based fees to Fidelity through a contract with no termination date—warranted closer scrutiny by the defendant's plan committee. In that case, the plan committee "never assessed the reasonableness

of fees using any form of a competitive bid process, RFP or otherwise." Here, Defendants could have obtained substantially lower fees for comparable recordkeeping services if they had undertaken a truly competitive bidding process for recordkeeping services during the Class Period.

192.    The total amount of recordkeeping and administrative fees paid during the Class Period on a per participant basis has been excessive and unreasonable. Based on Plaintiffs' investigation and analysis, normal recordkeeping fees for plans with similar assets and fewer than 12,000 participants would have been between $30 and $40 per participant at the *beginning* of the Class Period in 2015, and lower in ensuing years as a reflection of the general trend of decreasing recordkeeping fees. *See, e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d 786 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing the plan to pay not more than $35 per participant for recordkeeping).

193.    Given the size of the Plans during the Class Period and total number of unique participants, in addition to the general trend towards lower recordkeeping and administrative expenses in the marketplace as a whole, the Plans could have obtained services that were comparable to or superior to the typical services that would have been provided by their recordkeeper.

194.    In this case, the outside limit of a reasonable recordkeeping and related administrative fees for the Plans would have been no more than $30-$40 per participant, per year

for each Plan. However, in 2018 the Plans' participants paid over $124.00 per year for such services. In 2019, the Plans' participants paid over $85.00 per year for such services. The Plans participants have paid grossly excessive recordkeeping and administrative fees during the Class period.

## FIRST CLAIM FOR RELIEF

### Breaches of Fiduciary Duties Prudence

195.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

196.    At all relevant times, Defendants were fiduciaries of the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plans or disposition of the Plans' assets.

197.    As fiduciaries of the Plans, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

198.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. It did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the interest of the Plans' participants and beneficiaries. Instead, Defendants selected and retained investment options in the Plans despite the high cost and underperformance of those funds in relation to other comparable investments. Defendants also failed to investigate the availability of lower-cost share classes which were available for the majority of the mutual funds in the Plans. In addition, Defendants failed to monitor

the low return of the Prudential separate account stable value fund, which paid an excessive spread to Prudential and which underperformed other stable value funds that were widely available in the marketplace. They also failed to incorporate collective trusts as an alternative to mutual funds, even though this type of investment vehicle generally provides the same investment management services at a lower cost. Likewise, Defendants failed to monitor or control the grossly excessive compensation paid for recordkeeping services.

199.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars in losses due to excessive costs and lower net investment returns. Had Defendants properly discharged their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants and beneficiaries would have had more money available to them for their retirement.

200.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

### SECOND CLAIM FOR RELIEF

#### Failure to Adequately Monitor Other Fiduciaries

201.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

202.    UMMS had the authority to appoint and remove fiduciaries of the Plans. UMMS appointed members of the Employee Benefits Committee to serve as fiduciaries to the Plans.

203.    UMMS had a duty to monitor the Plans' fiduciaries to ensure that they were adequately performing fiduciary obligations, and to take prompt and effective action to protect the Plans in the event that Plans' fiduciaries were not fulfilling those duties.

204.     UMMS had a duty to (i) ensure that fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); (ii) had adequate financial resources and information; (iii) maintained adequate records of the information on which they based their decisions and analyses with respect to the Plans' investments; and (iv) reported regularly to UMMS.

205.     As a consequence of the foregoing breaches of the duty to monitor, the Plans suffered millions of dollars of losses. Had UMMS complied with its fiduciary obligations, the Plans would not have suffered these losses, and Plans' participants would have had more money available to them for their retirement.

206.     Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), UMMS is liable to restore to the Plans all losses caused by their failure to adequately monitor other fiduciaries. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and request that the Court awards the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.     Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.     A Declaration that Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling Defendants to make good to the Plans all losses to the Plans resulting from their breaches of their fiduciary duties, including losses to the Plans resulting from imprudent investment of the Plans' assets and excessive administrative expenses, and to restore to

the Plans all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

  E. An order requiring the Defendants to disgorge all profits received from, or in respect of, the Plans, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against Defendants as necessary to effectuate said relief, and to prevent Defendants' unjust enrichment;

  F. Actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

  G. An order enjoining Defendants from any further violations of ERISA fiduciary responsibilities, obligations, and duties;

  H. Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plans and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

  I. An award of pre-judgment interest;

  J. An award of costs pursuant to 29 U.S.C. § 1132(g);

  K. An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

  L. Such other and further relief as the Court deems equitable and just.

Dated: July 22, 2021   By: */s/ Andrea R. Gold*
         Andrea Gold (Bar No. 18656)
         **TYCKO & ZAVAREEI LLP**
         1828 L St. NW, Suite 1000
         Washington, DC 20036
         Telephone: (202) 973-0900
         Facsimile: (202) 973-0950
         agold@tzlegal.com

         Eric Lechtzin*
         Marc H. Edelson*
         **EDELSON LECHTZIN LLP**
         3 Terry Drive, Suite 205
         Newtown, PA 18940
         Telephone: (215) 867-2399
         Facsimile: (267) 685-0676
         elechtzin@edelson-law.com
         medelson@edelson-law.com

         Michael C. McKay*
         **MCKAY LAW, LLC**
         5635 N. Scottsdale Road, Suite 117
         Scottsdale, Arizona 85250
         Telephone: 480-681-7000
         Facsimile: 480-348-3999
         Email: mmckay@mckaylaw.us

         *Counsel for Plaintiffs and the*
         *Proposed Class*

*Application for admission *pro hac vice* is forthcoming.